# REDACTED OPINION

# In the United States Court of Federal Claims

No. 14-713C
Filed: December 5, 2014
Redacted Version Issued for Publication: February 11, 2015[1]

```
* * * * * * * * * * * * *
```

| | |
|---|---|
| **FRAMACO INTERNATIONAL, INC.,** * | |
| * | **Bid Protest; Omnibus Diplomatic** |
| **Protestor,** * | **Security and Antiterrorism Act of** |
| * | **1986; Past Project Adjustment for** |
| **v.** * | **Inflation.** |
| * | |
| **UNITED STATES,** * | |
| * | |
| **Defendant,** * | |
| * | |
| **v.** * | |
| * | |
| **CADDELL CONSTRUCTION** * | |
| **COMPANY,** * | |
| * | |
| **Defendant-Intervenor.** * | |

```
* * * * * * * * * * * * *
```

   **Jonathan D. Shaffer**, Smith Pachter McWhorter PLC, Tysons Corner, Virginia, for protestor. With him were **Mark E. Hanson**, **Mary Pat Buckenmeyer, Daniel R. Rounds**, Smith Pachter McWhorter PLC, Tysons Corner, Virginia.

   **Veronica N. Onyema**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With her were **Joyce R. Branda**, Acting Assistant Attorney General, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation. Of counsel, **John W. Cox,** Office of the Legal Adviser, United States Department of State.

   **Dirk Haire**, Fox Rothschild LLP, Washington D.C., for intervenor. With him were **Alexa Santora** and **Benjamin Kussman**, Fox Rothschild LLP, Washington D.C.

---

[1] This opinion was issued under seal on December 5, 2014. The parties were asked to propose redactions prior to public release of the opinion. This opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the following notation: "[redacted]."

**O P I N I O N**

<u>**HORN, J.**</u>

Protestor, Framaco International, Inc., (Framaco) filed the above captioned bid protest in this court against the United States, acting through the United States Department of State (DOS), Bureau of Overseas Buildings Operations (OBO) Office of Acquisitions, Acquisition Management. Protestor is "a construction management and procurement firm providing turnkey overseas services to the U.S. government and global construction companies." Protestor challenges OBO's decision not to prequalify Framaco to compete under the Request for Proposals (RFP) in Solicitation No. SAQMMA-14-R0115 to design and construct a new embassy compound (NEC) in Harare, Zimbabwe (Harare, Zimbabwe project).

Protestor claims in its bid protest complaint that the "Harare, Zimbabwe procurement is being conducted in two phases – the first for prequalification and the second under which prequalified offerors are allowed to submit proposals in response to the solicitation and to participate in site visits." Protestor notes that "[i]n order to prequalify, offerors needed to submit documentation to allow OBO to evaluate its capabilities" and that "[d]uring Phase I, the agency declared Framaco ineligible to compete in Phase II." Framaco indicates, at the time the protest was filed, the agency had not yet issued the RFPs under Phase II. Therefore, Framaco "seeks to participate as a prequalified offeror in this procurement for construction of the NEC in Harare, Zimbabwe." Specifically, Framaco seeks a declaratory judgment that defendant violated federal procurement law and regulation, as well as the terms of the Solicitation by failing to prequalify Framaco for the Harare, Zimbabwe project. Protestor also seeks injunctive relief directing defendant to reinstate or otherwise prequalify Framaco to compete under the RFP for the Harare, Zimbabwe project.

**FINDINGS OF FACT**

On March 10, 2014, OBO issued a "**Notice of Solicitation of Submissions for Contractor Pre-Qualification**" (the Notice of Solicitation) (emphasis in original) for a design-build contract for the United States Embassy in Harare, Zimbabwe, RFP SAQMMA-14-R0115. The Notice of Solicitation described the project as one for "the design and construction of a New Embassy Compound to house U.S. Diplomatic functions." The Notice of Solicitation stated:

The New Embassy Compound) [sic] will be constructed on a US Government owned site located on 16.5 acres of land adjacent to the West Gate Shopping Center near Lorraine Drive in Harare, Zimbabwe. Anticipated work and approximate sizes includes: New Chancery (NOB), 12,668 gross square meters (gsm); Maintenance Facilities and high-bay Warehouse, 3185 gsm; Marine Security Guard Quarters, 1015 gsm; Recreational Facilities,261 [sic] gsm; Vehicle and Pedestrian Access Control Facilities, 528 gsm; ; [sic] Utility Building, 1015 gsm: Other Site

Work including Perimeter Security, Surface Vehicle Parking, Roadways, Landscaped and Planted Areas. The site is rectangular with roads on three sides and is approximately 16.5 acres. This project will be required to achieve LEED® Silver certification, as a minimum.

The Notice of Solicitation set forth an approximate design-build cost of $165 to $210 million. The Notice of Solicitation also indicated that the Solicitation was to "consist of two phases," the first phase for prequalification and the second phase during which the RFP would be released to the prequalified offerors, who then would be invited to submit proposals in response and participate in site visits. The Notice of Solicitation provided:

> ***Phase I – Pre-Qualification of Offerors***
> This announcement of solicitation of pre-qualification submissions is Phase I. DOS will evaluate the pre-qualification submissions based on the procedure and evaluation criteria set forth below.
>
> . . .
>
> ***Phase II – Requests for Proposals from Pre-Qualified Offerors***
> Those Offerors determined to be pre-qualified in accordance with this notice will be issued a formal Request for Proposal (RFP) for the project and invited to submit proposed pricing in Phase II.

(emphasis in original).

The Notice of Solicitation informed offerors that, with a single submission, they could seek prequalification for the Harare, Zimbabwe project and four other projects: United States Embassy Pristina, Kosovo, RFP SAQMMA-13-R0118; United States Embassy/Consulate Ashgabat, Turkmenistan, RFP SAQMMA-14-R0108; United States Consulate Nuevo Laredo, Mexico, RFP SAQMMA-14-R0117; and United States Consulate Erbil, Iraq, RFP SAQMMA-14-R0101. The Notice of Solicitation instructed that multiple submissions were not required for each project and that "[o]fferors seeking multiple project qualifications must list all projects for which qualification is sought in the cover letter." The Notice of Solicitation indicated that "[t]he Government would evaluate and consider the qualification package submitted in relation to the requirements for qualification described in each separate project Notice of Solicitation of Submission for which qualification is requested."

The Notice of Solicitation provided that, "[f]irms submitting information for Phase I qualification shall address the following criteria in the proposal to provide design and construction services." Under section "**4. _Mandatory Pre-Qualification Requirements_**" (emphasis in original), the Notice of Solicitation indicated that, "[t]he Offeror shall submit sufficient documentation to allow DOS to evaluate its capabilities with respect to the factor(s) and qualification criteria listed. Submissions that are missing the required information or otherwise do not comply with the submission requirements may be eliminated from consideration at the Contracting Officer's determination." Moreover, of

particular relevance to the current protest, the Notice of Solicitation instructed:

> To demonstrate performance of similar construction work for Omnibus Diplomatic Security and Antiterrorism Act of 1986 purposes, the offeror needs to provide information demonstrating that it has successfully completed in the United States or at a U.S. diplomatic or consular mission a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of at least $124 million.

(emphasis added). The Notice of Solicitation required that "ALL SUBMISSIONS MUST BE RECEIVED BY 3:00 P.M. Eastern Time on April 16, 2014" (capitalization in original), and indicated "REQUESTS FOR CLARIFICATIONS must be submitted in writing to Jillian Savage AND David Vivian by email SavageJM@state.gov AND Alt AQM viviandw@state.gov." (capitalization and emphasis in original). Under section "4.A. Omnibus Diplomatic Security and Antiterrorism Act of 1986," the Notice of Solicitation further explained the application of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Diplomatic Security Act).[2]  The Notice of Solicitation provided:

---

[2] Codified at 22 U.S.C. § 4852 (2012), the Diplomatic Security Act provides:

**(a) Preference for United States contractors**

Notwithstanding section 302 of this title, and where adequate competition exists, only United States persons and qualified United States joint venture persons may—

> (1) bid on a diplomatic construction or design project which has an estimated total project value exceeding $10,000,000; and

> (2) bid on a diplomatic construction or design project which involves technical security, unless the project involves low-level technology, as determined by the Secretary of State.

. . .

**(c) Definitions**

For the purposes of this section—

. . .

> (2) the term "United States person" means a person which—

. . .

Firms being considered for award under this acquisition are limited to "*United States Person*" bidders as defined in the Act. The Offeror must complete and submit as part of its pre-qualification package the pamphlet "Certifications Relevant to Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986." (*The pamphlet is attached to this FEDBIZOPPS announcement and may be obtained from the DOS Contract Specialist listed at the end of this notice.*) . . . This is a pass/fail evaluated area. Submissions from Offerors who do not receive a pass rating in this area will not be further evaluated. Sufficient information should be provided in the Certifications and attachments thereto to determine eligibility under Public Law 99-399, but the Department reserves the right to consider information available from other sources, or to obtain clarifications or additional information from the Offeror.

(emphasis in original). A pamphlet titled: "CERTIFICATIONS RELEVANT TO PUBLIC LAW 99-399 Statement of Qualifications for Purpose of Section 402 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99-399)" (capitalization in original), was attached to the Notice of Solicitation. The pamphlet instructed prospective offerors to "*Use this Guide for All FY 2014 Project Submissions Include a copy in each Qualification Submission.*" (emphasis in original). The pamphlet explained that:

Section 402 of the Omnibus Diplomatic and Antiterrorism Act of 1986 provides that a "United States person" must meet certain requirements, listed in subsections 402(c)(2) and (3) of the Act, to be eligible for the statutory preference. To assist individuals to determine whether or not they qualify as a U.S. person . . . entitled to preference under Section 402, guidance is provided on this pre-qualification form.

For ease of reference, the statutory language will be quoted immediately before the definitions that apply to it. Space for the information requested is provided immediately following definitions. The Department of State reserves the right, in its sole discretion, to interpret and apply the definitions to the information provided by each prospective offeror.

---

(D) has performed within the United States or at a United States diplomatic or consular establishment abroad administrative and technical, professional, or construction services similar in complexity, type of construction, and **value** to the project being bid[.]

Omnibus Diplomatic Security and Antiterrorism Act of 1986, Pub. L. No. 99-399, § 402, 100 Stat. 853, 864 (1986) (as codified and amended at 22 U.S.C. § 4852) (emphasis to word "value" added).

In relevant part, the pamphlet stated:

> Section 402 (c) (2) (D): "The term 'United States person' means a person which—has performed within the United States**, or at a United States diplomatic or consular establishment abroad** administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid."

(emphasis in original). Following the quoted statutory language, the pamphlet defined certain terms, including "**VALUE**" (capitalization and emphasis in original), which was defined as follows:

> "**VALUE**"—This term refers to the total contract price of the project, not to the profit or loss to the contractor.

(capitalization and emphasis in original). The pamphlet then provided a space for the prospective offeror to include a certification of its similar projects, as follows:

> **Certification #4:** List on this page and an attachment if necessary, one or more similar projects completed by the prospective offeror. For each project, provide the following information:
> Location:_____(city and state)
> Type of service:_____(administrative, etc.)
> Complexity:_____(office building, etc.)
> Type of construction:_____
> Value of project:_____
> If the prospective offeror's participation was as a partner or co-venturer, indicate the percentage of the project performed by the prospective offeror:_____.

(emphasis in original).

    On April 7, 2014, approximately nine days before the prequalification submission deadline, and as instructed in the Notice of Solicitation regarding requests for clarifications, President of Framaco Paul Kacha sent an email to DOS employee Jillian Savage and to DOS contracting officer David Vivian,[3] seeking clarification on the value figure provided in the Notice of Solicitation. Mr. Kacha wrote:

---

[3] The Administrative Record is unclear as to Jillian Savage's job title at DOS. Correspondence from counsel for Framaco addresses Ms. Savage as a "Contracting Officer." It is clear from the record that Mr. Vivian was a contracting officer.

We reviewed the pre-qualification Notice for the new Harare post.

The below Phase I requirements calls for a $124M completed US diplomatic mission.

Kindly advise if we can apply using a $122M completed project that was awarded in 2009 and if needed adjusting to inflation to meet the Harare requirement?

Mr. Kacha copied into his email to the DOS the language from the Notice of Solicitation regarding "***Mandatory Pre-Qualification Requirements***" (emphasis in original), including the language setting forth the $124 million contract value threshold, which stated:

To demonstrate performance of similar construction work for Omnibus Diplomatic Security and Antiterrorism Act of 1986 purposes, the offeror needs to provide information demonstrating that it has successfully completed in the United States or at a U.S. diplomatic or consular mission a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of at least $124 million.

Later, on the morning of April 7, 2014, Mr. Vivian responded via email to Mr. Kacha's email, copying Ms. Savage and Michael Scott,[4] indicating: "The stated minimum is $124. You may attempt to explain or justify why the Government should consider a number less than the stated minimum but that is your decision and it may not be successful."

Protestor timely sent in a submission seeking prequalification for all five 2014 Design-Build Contracts: United States Embassy Pristina, Kosovo, RFP SAQMMA-13-R0118; United States Embassy Harare, Zimbabwe, RFP SAQMMA-14-R0115; United States Embassy/Consulate Ashgabat, Turkmenistan, RFP SAQMMA-14-R0108; United States Consulate Nuevo Laredo, Mexico, RFP SAQMMA-14-R0117; and United States Consulate Erbil, Iraq, RFP SAQMMA-14-R0101. In the cover letter to its prequalification package, Framaco indicated "extensive experience of working successfully with the Department of State, Bureau of Overseas Buildings Operations (DOS OBO) on several embassy, consulate, and housing projects, often in challenging environments," and that it had "finished construction of the new 122M USD Design-Built [sic] US Embassy Compound in Belgrade, Serbia successfully."

As a reference project, Framaco submitted its contract for the Belgrade, Serbia NEC performed by Framaco from February 2009 to October 2013. Framaco's prequalification package contained a section titled "**Factor 4.0. Proof of Completion of**

---

[4] The Administrative Record is unclear regarding Michael Scott's job title and involvement in the procurement under consideration.

**Project Approximately $120 million**" (emphasis in original), in which Framaco sought to demonstrate that it met the stated Solicitation requirements because the inflation-adjusted contract value for the Belgrade, Serbia project exceeded $124 million. Framaco "attached inflation adjusted calculations" and requested "OBO to take into account the present value of Framaco's historical work." In its prequalification package, Framaco stated:

> With respect to the below requirement for all 5 above referenced projects:

> *To demonstrate performance of similar construction work for Omnibus Diplomatic Security and Antiterrorism Act of 1986 purposes, the offeror needs to provide information demonstrating that it has successfully completed in the United States or at a U.S. diplomatic or consular mission a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of at least $.... million.*

> The magnitude of the 2014 minimum completion requirements is triggered by an increased scope such as housing facilities. Framaco has already successfully completed these type of facilities as part of its experience (Ex. US$[redacted]+ [redacted] NEC, Housing Facilities).

> Considering the successful completion of the Design Built US Embassy NEC, Belgrade, Framaco would like to submit the attached inflation adjusted calculations for your evaluation. Based on the 2009 awarded price of $122,682,228 for the Belgrade Project and the present value of the Serbia project would be $133,272,995 [sic]

> The United States Congress and the Office of Federal Procurement Policy have stated a clear policy preference for maximum competition through the Competition in Contracting Act ("CICA") and the Federal Acquisition Regulation ("FAR"). OBO procurements remain subject to requirements of CICA and the FAR. Accordingly, the qualification requirements of the Omnibus Act must be interpreted in a manner that does not unduly and impermissibly restrict competition. We understand that OBO in the past has considered the present value of projects previously performed by a contractor. We would appreciate OBO to take into account the present value of Framaco's historical work. If the Framaco projects and specifically the NEC in Belgrade, Serbia was adjusted to reflect inflation and the present value of money, Framaco's project in the aggregate substantially exceed the estimated value of the 2014 procurements. We hope that OBO's conclusion will be consistent with the letter or spirit of the Omnibus Act requirements.

(emphasis and omission in original).

Framaco presented "**Inflation Adjustment Calculations for the US Embassy Belgrade Project**" including a chart of "**US Inflation per month**" between February 2009 and March 2014 using inflation rates from the "**US Bureau of Labor Statistics**." (emphasis in original). Framaco also offered a timeline of events for the Belgrade, Serbia project, which indicated Award on February 17, 2009, Substantial Completion on March 29, 2013, Final Acceptance on October 31, 2013, and Prequalification Submission on April 16, 2014. Framaco indicated that the "**Contract Amount**" at the time of "**award**" was $117,137,704.00 and at the time of "**s[ubstantial] completion**" was $122,682,229.00. (all emphasis in original). Framaco concluded "**Average Inflation per month between a& d**" (emphasis in original) was 0.1358% and "Inflation adjust Contract Completion Price based on the substantial completion date (61 terms)" produced an "**Inflation Adjusted Contract Value**" of $133,272,995.00.[5] (emphasis in original). Also in support of Framaco's Factor 4.0 submission, Framaco attached a March 29, 2013 Certificate of Substantial Completion letter and an October 31, 2013 Final Acceptance letter for the Belgrade, Serbia project, both from the DOS.

In its prequalification package under a section titled "**Factor 4.A.  Omnibus Diplomatic Security and Antiterrorism Act of 1986**" (capitalization and emphasis in original), Framaco also filled out and attached the pamphlet titled "CERTIFICATIONS RELEVANT TO PUBLIC LAW 99-399 Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986 (Public Law 99-399)." (capitalization in original).

In accordance with Section 402(c)(2)(D) of the Diplomatic Security Act, and as instructed in the pamphlet, Framaco responded to the request to comply with the term "United States person" having "performed within the United States**, or at a United States diplomatic or consular establishment abroad** administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid." (emphasis in original). In its submission, Framaco indicated:

> **Certification #4:** List on this page and an attachment if necessary, one or more similar projects completed by the prospective offeror. For each project, provide the following information:
> Location: **Please see the Attachment "Certification #4"**(city and state)
> Type of service:_____(administrative, etc.)
> Complexity:_____(office building, etc.)
> Type of construction:_____
> Value of project:_____
> If the prospective offeror's participation was as a partner or co-venturer,

---

[5] Framaco explained in its July 1, 2014 Agency Level Bid Protest that the chart "shows the U.S. inflation by month for the years 2009 to 2014. Using the average inflation of 0.1358 percent, the inflation adjustment contract complete price based on the March 29, 2013 substantial completion date is $133,272,995."

indicate the percentage of the project performed by the prospective offeror:_____.

(emphasis in original). In Certification #4, titled "Similar Projects," Framaco submitted the required information for [redacted] separate, previously-completed projects. Specific to the Belgrade, Serbia project submitted by the protestor to prequalify for the Harare, Zimbabwe project, Framaco provided the following chart:

| Location | Belgrade, Serbia |
| --- | --- |
| Type of service | Design & Build |
| Complexity | New US Embassy Complex |
| Type of construction | An Embassy Compound with 17000 m2 of concrete buildings, 1000 m2 of pre-engineered canopy structures, 9500 m2 of site development, site utilities, technical security and communication systems |
| Value of project | US$ 122,682,229 |
| the percentage of the project performed by the prospective offeror | 100% |

The Belgrade, Serbia project was the highest value project that Framaco submitted to prequalify for the Harare, Zimbabwe project and the other four projects in the solicitation. The next highest value projects after Belgrade, Serbia submitted by Framaco to qualify for the various projects included in the solicitation were a "Design & Build" contract in [redacted] for US$ [redacted] and another, separate "Design & Build" contract in [redacted] for US$ [redacted].

On May 12, 2014, DOS attorney Dennis J. Gallagher sent an internal DOS memorandum to Donna Neal,[6] also of DOS, titled "U.S. Person Qualification for Five Projects" (May 12, 2014 Gallagher Memorandum). The May 12, 2014 Gallagher Memorandum indicates that, in an earlier memorandum dated April 18, 2014, Ms. Neal had requested a department review by Mr. Gallagher's office:

of Certifications Relevant to Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 submitted by 17 potential offerors on one or more of the following solicitations:

1) SAQMMA14R0101 NCC Erbil, Iraq ($250-300 million)
2) SAQMMA14R0108 NEC Ashgabat, Turkmenistan ($180-200 million)

---

[6] Donna Neal's job title is unclear from the Administrative Record. In some documents, Ms. Neal is described as a "Contract Specialist." In other documents, she is referred to as a "Contracting Officer."

      3) SAQMMA14R0115 NEC Harare, Zimbabwe ($165-210 million)
      4) SAQMMA14R0118 NEC Pristina, Kosovo ($155-205 million)
      5) SAQMMA14R0117 NCC Nuevo Laredo, Mexico ($68-95 million)

The May 12, 2014 Gallagher Memorandum provides that "[a]ll findings . . . are based on the certifications and other prequalification materials submitted by the prospective offerors and assume the truth of these representations unless otherwise noted." The May 12, 2014 Gallagher Memorandum notes:

there continues to be a good deal of uncertainty as to the application of certain requirements of Section 402 of P.L. 99-399. In particular, there are inconsistent decisions by the Court of Federal Claims and the Government Accountability Office as to whether the business volume requirement may be satisfied by cumulative business volume in 3 years of the 5 year period prior to the solicitation exceeding the value of the project or whether business volume in each of three years of the five year period is required. For purposes of this review, I have applied the cumulative business volume standard, but have notes [sic] instances in which the offeror would not meet the standard articulated by GAO [Government Accountability Office], in which the offeror must show business volume meeting or exceeding the project value in each of 3 of the last five years.

The May 12, 2014 Gallagher Memorandum also states:

There has also been some uncertainty as to what project value should be required for the construction services to be considered similar in value to the project being solicited. To avoid uncertainty, each FedBizOpps announcement provided that to meet the experience requirement a potential offeror must have completed a construction contract involving work of the same general type and complexity as the project for which it seeks prequalification and having a contract or subcontract value exceeding a specified amount as follows: 1) Erbil $187 million; 2) Ashgabat $135 million; 3) Harare $124 million; 4) Pristina $116 million; 5) Nuevo Laredo $51 million.

The May 12, 2014 Gallagher Memorandum proceeds to consider each of the seventeen potential offerors[7] ten of which sought to prequalify for the Harare, Zimbabwe project. As reflected in the Administrative Record, in an undated DOS Internal Record of Offerors,[8] eight of the ten potential offerors seeking prequalification for the Harare,

---

[7] The May 12, 2014 Gallagher Memorandum did not fully consider Offeror #17, the offer from the Weitz-Watts Joint Venture, because Mr. Gallagher indicated in the memorandum that he was "unable to locate this volume" because it "either was not submitted in the boxes for review or has been inadvertently misplaced."

[8] As reflected in the Administrative Record, the DOS Internal Record of Offerors

Zimbabwe project were prequalified by DOS and found eligible to bid on the Harare, Zimbabwe project. These companies were: B.L. Harbert International, LLC; ECC International, LLC; Caddell Construction Co., LLC, the intervenor in the protest currently before the court, (Caddell); WATTS Constructors, Inc.; Perini Management Services; KBR Federal Services, LLC; American International Contractors (Special Projects), Inc.; and Pernix Group, Inc., bidding alone.[9] As reflected in the May 12, 2014 Gallagher Memorandum and the DOS Internal Record of Offerors, two potential offerors were found ineligible to compete and denied prequalification for the Harare, Zimbabwe project: Framaco and ACC Construction Company, Inc. (ACC). Regarding Framaco, also known as Offeror #2, which had sought prequalification for all five projects, the May 12, 2014 Gallagher Memorandum indicates, in relevant part:

> Framaco's reported business volume meets the COFC [United States Court of Federal Claims] cumulative standard for all 5 projects but meets the GAO 3 of 5 years standard only for Neuvo [sic] Laredo. Framaco's largest completed project is the Belgrade NEC ($122.6 million). This meets the FedBizOpps thresholds only for Pristina and Nuevo Laredo.
>
> Recommendation: Framaco should be deemed prequalified for Pristina and Nuevo Laredo but not for the other three projects.

The May 12, 2014 Gallagher Memorandum does not specifically mention or discuss Framaco's request for DOS to utilize an inflation adjustment to reach the $124 million threshold. Regarding the other potential offeror which was denied prequalification for the Harare, Zimbabwe project, ACC, Offeror #15, the memorandum concluded that ACC's "largest projects are a [redacted] project and a [redacted] complex with contract values of $[redacted] million and $[redacted] million respectively. This would meet the contract value threshold only for Nuevo Laredo." As reflected in the May 12, 2014 Gallagher Memorandum and the DOS Internal Record of Offerors, for the eight offerors which were prequalified for the Harare, Zimbabwe project, all but Pernix Group, Offeror #11, bidding alone, appear to have listed previous contracts that met the $124 million contract value threshold. Regarding Pernix Group, Offeror #11, the May 12, 2014 Gallagher Memorandum recommended prequalification for the Pernix Group for the

_____

provides the prequalification status of the potential offerors for the five projects, yet uses some names for the companies different from those used in the May 12, 2014 Gallagher Memorandum. For instance, the DOS Internal Record of Offerors refers to one company as WATTS Construction, whereas the May 12, 2014 Gallagher Memorandum refers to the company as WATTS Constructors, Inc.

[9] The name Pernix appears three times in the May 12, 2014 Gallagher Memorandum: first, as a joint venture proposer listed as Aecom/Pernix Joint Venture, Offeror #5; second, as Pernix Group, Inc., Offeror #11; and third, as a joint venture proposer Pernix Group/Aecom Government Services, Offeror #12. The joint venture proposers which included Pernix, Offerors #5 and #12, sought prequalification only for the Nuevo Laredo, Mexico project.

Harare, Zimbabwe project. The May 12, 2014 Gallagher Memorandum states:

> Pernix lists business volumes for the three years from 2011 to 2013 that exceeds $[redacted] million cumulatively. This would meet the COFC cumulative business volume standard but would not meet the GAO interpretation that the annual business volume for each of 3 years must exceed the project value. For similar construction experience Pernix lists one [redacted] office building construction project [redacted] whose value is much less than the estimated value of the Harare or Pristina projects. Pernix also lists a larger contract ($[redacted] million) for a variety of construction work at the [redacted] that it performed as the majority partner in a joint venture. This site is part of the [redacted] diplomatic mission and the work at least in part appears similar in complexity and type of construction to the Pristina and Harare projects and also meets the contract value thresholds set for these two projects.

> Recommendation: Pernix has demonstrated that it meets the prequalification requirements for Harare and Pristina, and should be deemed eligible to offer on those projects.

Although $[redacted] million is less than the $124 million contract value requirement for prequalification for the Harare, Zimbabwe project, the May 12, 2014 Gallagher Memorandum, nonetheless, prequalified the Pernix Group, Offeror #11, and recommended it be allowed to proceed to Phase II of the competition.[10]

---

[10] Upon reviewing the Administrative Record, including the May 12, 2014 Gallagher Memorandum and the DOS Internal Record of Offerors, the court identified the monetary disparity regarding the prequalification of Pernix Group, Offeror #11. The court, therefore, issued an Order asking the parties to address why Pernix Group, bidding alone as Offeror #11, had been recommended for prequalification for the Harare, Zimbabwe project, although it had submitted a past project having a contract value of only $[redacted] million, which was below the $124 million contract value threshold requirement indicated to qualify for the Harare, Zimbabwe project. In defendant's reply in support of its motion for judgment on the Administrative Record, defendant conceded that "DOS misapplied the $124 million threshold when it pre-qualified offeror Pernix Group, Inc. (Pernix Group) for the Project, although it did not consider inflation in doing so." Defendant indicated that "DOS has since dis-qualified Pernix Group." Defendant attached a declaration from Dennis Gallagher, Assistant Legal Adviser in the Office of the Legal Adviser to DOS and author of the May 12, 2014 memorandum. In his declaration, Mr. Gallagher acknowledges "Pernix Group listed a contract of $[redacted] million for a construction project the [redacted] as evidence of prior, similar work." Mr. Gallagher explained that although he had "concluded that Pernix Group met the pre-qualification requirement," he had "reached this conclusion in error because the threshold requirement contained in the Notice of Solicitation required a contract or subcontract value of at least $124 million." Mr. Gallagher indicated that he had not considered inflation or other adjustments in the May 12, 2014 Gallagher

On June 3, 2014, contracting officer David Vivian notified Framaco of its "Successful/Unsuccessful Prequalification" for the five projects. The letter indicated Framaco did not qualify for the Harare, Zimbabwe project and, thus, would be ineligible to submit a proposal for the project when the agency issues the Solicitation, although Framaco did prequalify for the Pristina, Kosovo and Nuevo Laredo, Mexico projects. The letter stated:

> Based on the information provided in the prequalification package submitted by Framaco International Inc., Framaco International Inc. did not meet the technical requirements for prequalification for the 2014 Design-Build Construction Service for SAQMMA-14-R0101: Erbil, Iraq, SAQMMA-14-R0108: Ashgabat, Turkmenistan and SAQMMA-14-R0115: Harare, Zimbabwe projects.

> However based on the information provided in the prequalification package submitted by Framaco International Inc., Framaco International Inc., has met all the requirements for prequalification for the 2014 Design-Build Construction Service for SAQMMA-14-R0118: Pristina, Kosovo and SAQMMA-14-R0117: Nuevo Laredo, Mexico projects.

The letter also provided instructions and timelines for the procurement process for prequalified bidders:

> Based on the current schedule, we plan to begin issuing the Request for Proposal (RFP) for the prequalified referenced projects in late July 2014. Once the RFP is released, a separate letter will be issued with the ProjNet Key Codes to access the RFP.

> Project and site specific discussions will be addressed during the site visit, which will occur after release of the Request for Proposal (RFP)

---

Memorandum when he previously concluded that Pernix Group met the threshold.

Mr. Gallagher also indicated that, "[d]ue to this error, I have reviewed my May 12, 2014 memorandum to determine whether I made this same error when applying the $124 million threshold to the other prospective offerors on the Project." Mr. Gallagher concluded he had not done so. Mr. Gallagher also "advised AQM [the Office of Acquisition Management] at DOS that it should amend its prior notice to Pernix Group to indicate that Pernix Group is not pre-qualified to participate in Phase II of the Project." In addition, defendant submitted a letter from contracting officer David Vivian to Pernix Group, dated September 1, 2014, informing Pernix Group of the error and indicating that, "[b]ased on the information provided in the prequalification package submitted by Pernix Group, Inc., Pernix Group, Inc. does not meet all the requirements for prequalification for the 2014 Design-Build Construction Service for the SAQMMA-14-R0115 Harare, Zimbabwe."

documents. Site visits usually take place approximately two weeks after RFP issuance.

On June 9, 2014, Framaco requested a pre-award debriefing regarding the Erbil, Iraq; Ashgabat, Turkmenistan; and Harare, Zimbabwe projects and received an oral debriefing from the agency on June 12, 2014. During the debriefing, Framaco requested the agency conduct a reconsideration of the determination on contract value. On June 13, 2014, Ms. Neal sent a DOS internal memorandum to Mr. Gallagher regarding Framaco's "Request for reconsideration of the Statement of Qualifications Questionnaire" for the Harare, Zimbabwe project, as well as for the Erbil, Iraq and Ashgabat, Turkmenistan projects. Ms. Neal's June 13, 2014 Memorandum also attached a blank form for Mr. Gallagher's comments. Ms. Neal explained that during the debriefing, Framaco "advised that the combined values of the project in Belgrade and the present value of the Serbia project should have qualified them for the remaining 3 projects for which they are seeking prequalification. This information can be located on page 1 of 3 under Factor 4.0." On June 16, 2014, Mr. Gallagher responded to Ms. Neal on the completed form:

> Per telecon, Framaco seems to be arguing that the $122 million contract value for Belgrade, Serbia NEC project should be adjusted upward. There is nothing in the FedBizOpps announcement or in the law/regulation to support such an adjustment, and no showing that such an adjustment is warranted. I recommend that the prequalification determinations with respect to Framaco not be changed.

On June 24, 2014, Ms. Neal responded by letter to Mr. Kacha. The letter stated:

> During the debriefing conducted on June 12, 2014 a request for reconsideration was made of the prequalification package submitted by Framaco International Inc. The reconsideration request is based on the position that Framaco International Inc. states that the $122 million contract value for Belgrade and Serbia NEC projects should be adjusted upward.
>
> There is nothing in the FedBizOpps announcement or in the regulation/law to support such an adjustment, and no showing of such and [sic] adjustment is warranted. Therefore Framaco International Inc. remain s [sic] not meeting the technical requirements for prequalification for the 2014 Design-Build Construction Service for SAQMMA-14-R0101: Erbil, Iraq, SAQMMA-14-R0108: Ashgabat, Turkmenistan and SAQMMA-14-R0115: Harare, Zimbabwe projects.

On July 1, 2014, counsel for Framaco filed an agency level protest with the contracting officer, requesting a decision at a level above the contracting officer, pursuant to FAR § 33.103(d)(4) (2013). Framaco indicated it was "not challenging the OBO's determination to disqualify Framaco for the OBO Erbil, Iraq and Ashgabat,

Turkmenistan projects" and it "understand[s] the agency's analysis as to those larger projects and only challenge[s] the agency's decision with regard to the much smaller Harare, Zimbabwe project." Framaco stated:

> OBO's decision to disqualify Framaco is a violation of statute and regulation. The agency should recommend that the contracting officer determine Framaco prequalified for the 2014 NEC Harare, Zimbabwe project. In the alternative, the agency should recommend that the contracting officer conduct a new prequalification determination in accordance with the requirements of the applicable statutes and regulations and consistent with OBO's practices.

Framaco argued that:

> OBO's determinations are not consistent with the applicable statutes and regulations. Framaco has met the Section 402 subsection (D) requirement.  Framaco has performed similar construction services that exceed the threshold required here. OBO's interpretation treats Framaco in an inconsistent and arbitrary manner. OBO found Framaco qualified previously under almost identical situations. Moreover, OBO's disqualification relies on an unreasonable and unduly restrictive interpretation of subsection (D) contrary to Section 402 and CICA. 41 U.S.C. § 3301.

Moreover, Framaco urged that:

> Nothing in the Section 402 definitions limits the agency from adjusting past projects for inflation. This makes logical sense. If Congress had intended to limit competition solely to those offerors who had performed at least one project with a dollar value equal to or greater than the project being bid without any adjustments for inflation, Congress would have so specified. Previously, OBO interpreted subsection (D) to allow for adjustments for inflation. In the context of CICA and the overarching competition requirements, and given the construction services of the type being required here, especially where there are a limited number of potential offerors, the rules must be interpreted to allow for adjustments for inflation.

Framaco attached to its request the same inflation adjustment calculations chart that it had included in its prequalification package and stated:

> Attachment A shows the U.S. inflation by month for the years 2009 to 2014. Using the average inflation of 0.1358%, the inflation adjustment contract complete price based on the March 29, 2013 substantial completion date is $133,272,995. This is the figure OBO should use in determining the value of the Belgrade, Serbia project for the present procurement. This present value of the Belgrade, Serbia project is

substantially more than the $124 million needed to prequalify for the Harare, Zimbabwe NEC.

On July 21, 2014, Mr. Vivian responded to Framaco's request by issuing a "CONTRACTING OFFICER'S FINAL DECISION." (capitalization in original). Mr. Vivian denied Framaco's protest, as follows:

On March 10, 2014 the Department of State issued the referenced solicitation SAQMMA14R0115 for the Prequalification for the Design/Build contract competition of a New Embassy Compound in Harare, Zimbabwe. The solicitation announced that "Firms being considered for award under this acquisition are limited to "United States Person" [sic] bidders as defined in the Act." In response to this solicitation, Framaco submitted a Certification Relevant to Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of the Omnibus Diplomatic Security and Antiterrorism Act of 1986 (hereafter ("the Act"),. [sic] Part of the Act requires offerors to demonstrate completed projects that are considered similar in value to the project being solicited. In Harare's case, the range of magnitude provided in the solicitation is $165 to 210 million. The largest project submitted by Framaco to comply with this act was the Belgrade NEC $122.6 million dollar project; which is nearly $42.5 million dollars less than the minimum range for the Harare NEC project.

Furthermore, the announcement expressly indicates to all interest [sic] parties that in order "*To demonstrate performance of similar construction work for Omnibus Diplomatic Security and Antiterrorism Act of 1986 purposes, the offeror needs to provide information demonstrating that it has successfully completed in the United States or at a U.S. diplomatic or consular mission a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of at least **$124 million**.*" This is a specific, definite, and unequivocal reference to a mandatory threshold for qualification. There is no allowance in the announcement for adjustment of the stated threshold or to the value of the project that an interested party may offer to demonstrate that it has successfully completed performance of similar construction work. As indicated above, the project Framaco offers to demonstrate compliance is the Belgrade NEC valued at $122.6 million: the project value is insufficient to meet the stated threshold.

The FedBizOpps announcement and the Act do not indicate that an inflation adjustment to the project value is authorized or warranted; therefore, it would be improper for the Government to apply such an adjustment to any submission by any offeror. Please also note that the announcement and prequalification evaluation criteria has been totally revised and more clearly defined for 2014 so any allowance that may have

> been appropriate in previous years cannot be brought forward into this clearer unambiguous qualification process.
>
> Wherefore, in light of the above facts, Framaco failed to display completion of a project similar in value to the Harare NEC project as required by the Act and solicitation, therefore Framaco's protest is denied.

(emphasis in original). The contracting officer's July 21, 2014 letter also indicated that Framaco could seek review from the agency at a higher level than the contracting officer by appealing to the Departmental Competition Advocate, Office of the Procurement Executive (A/OPE), Department of State.

On July 23, 2014, Framaco submitted, what it referred to as, a "joint (a) request for reconsideration of the U.S. Department of State, Bureau of Overseas Building Operations' . . . July 21, 2014 'Final Decision' and (b) request that the agency protest official Daniel J. Walt consider this additional submission in support of the protest." In the July 23, 2014 request, Framaco argued that "[t]he agency's July 21, 2014 letter is inconsistent with the solicitation and recent developments known to the agency" insofar as it "inappropriately compares Framaco's Belgrade project to an asserted range for the total Harare project cost estimate of $165 to $210 million to claim that Framaco's Belgrade project is $42 million lower than required by the solicitation" because the Solicitation does not require offers to be within the range of $165 to $210 million. In the next line, however, the protestor acknowledged, through its attorney, that, "[t]he only relevant threshold for qualification is the $124 million amount provided in the FedBizOpps ('FBO') posting." Framaco argued that the agency "cannot change the ground rules in the middle of the procurement." Framaco further stated that "the agency analysis ignores the actual contract value for the Belgrade project." Moreover, Framaco asserted that "[a]ny reasonable analysis shows that the Belgrade project exceeds the agency's announced $124 million requirement." Framaco once again urged that an inflation adjustment should be used to reach "actual" value. Protestor also argued, "[i]n any event, the actual contract value for the Belgrade project exceeds $124 million even without an inflation adjustment" because of "approximately $[redacted] million in Requests for Equitable Adjustments ('REAs') that are outstanding on the Belgrade, Serbia project." Framaco requested "that the agency determine Framaco to be prequalified for the 2014 NEC Harare, Zimbabwe project" and stated, "[i]n the alternative, Framaco is seeking the agency to recommend that the contracting officer conduct a new prequalification determination in accordance with the requirements of the applicable statutes and regulations and consistent with OBO's previous practices."

On August 5, 2014, Eric N. Moore, the DOS Departmental Competition Advocate, sent a letter responding to Framaco, providing, "[a]s part of the independent review of this agency protest, we reviewed all of the above materials plus the solicitation and all other relevant supporting documentation." The letter concluded:

> Unfortunately, the solicitation does not include inflation adjustment as an evaluation method. As such, applying it to your response would prejudice

other responses on which it was not applied. The Contracting Officer therefore is unable to apply the inflation adjustment to any of the responses, including yours. As such, we concur with the Contracting Officer's decision that based on your response to the solicitation; the Department of State is unable to prequalify you to participate further in the procurement.

Subsequently, the protestor filed the above captioned bid protest with this court, asserting two claims: the first for "FAILURE TO EVALUATE IN ACCORDANCE WITH SOLICITATION TERMS" and the second for "DISPARATE TREATMENT" (capitalization in original), and requested the court to grant preliminary injunctive relief precluding the defendant from continued pre-award activities under the Harare, Zimbabwe project until after the court's ruling on the merits. Framaco also requests that the court grant "[a] judgment declaring that Defendant violated federal procurement law, regulation and the terms of the RFP by failing to prequalify Framaco for the Harare, Zimbabwe procurement." The court granted Caddell's motion to intervene in the proceedings. The parties cross-moved for judgment on the Administrative Record.[11]

## DISCUSSION

In its bid protest complaint, Framaco alleges two claims: the first for failure to evaluate in accordance with Solicitation terms and the second for disparate treatment. Regarding the first claim, protestor argues that to meet the Solicitation requirement of a project "involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of at least $124 million," Framaco submitted its Belgrade, Serbia project, which according to Framaco, met the requirement, albeit with an inflation adjusted contract value and/or an adjusted contract value for contract modifications based on outstanding REAs. Protestor argues that "[t]he agency's unduly narrow and restrictive interpretation of the solicitation is arbitrary, capricious, an abuse of discretion and otherwise contrary to statute and regulation." Protestor also asserts that the agency's actions "constitute a clear and prejudicial violation of its obligations under applicable law and regulation." The protestor contends that the Harare, Zimbabwe procurement is subject to the requirements of the Competition in Contracting Act, 41 U.S.C. § 3301 (2012) (CICA) and that the "OBO's present interpretation is anti-competitive and contrary to the CICA and the FAR because [it] substantially limits competition."

Protestor also argues that the agency engaged in disparate treatment. Protestor states it is "axiomatic that agencies must treat offerors on a fair and consistent basis" and indicates that agencies are barred from treating offerors on a disparate basis.

---

[11] Because DOS indicated that it intended to proceed to Phase II of the Solicitation on a specified date, and after careful review of all of the parties' submissions to the court, the court denied the protest in a telephone conference with all parties and indicated this written opinion would follow.

Protestor contends that "OBO has previously used inflation-adjusted contract values or contract values that take into account modifications, REAs and other contract adjustments in order to evaluate prequalification submissions." Protestor argues that "OBO has adopted an inconsistent and discriminatory interpretation of the Omnibus Act in a manner that materially prejudices Framaco," and that "[w]hen an agency departs from its prior practice in an inconsistent fashion such action is arbitrary and capricious." Protestor contends such "impropriety is significantly heightened where, as here, it limits competition, resulting in higher cost to the government." In protestor's motion for judgment on the Administrative Record, protestor also alleges that "OBO erred as a matter of law in determining that an inflation adjustment was barred by the terms of the solicitation, statute and regulation" and "OBO's improper exclusion of Framaco violated material terms of the solicitation, the Federal Acquisition Regulation and the Competition in Contracting Act . . . ."

The parties filed cross-motions for judgment on the Administrative Record.[12] Rule 52.1(c) of the Rules of the United States Court of Federal Claims (2014) governs motions for judgment on the Administrative Record. The court's inquiry is directed to "'whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" Mgmt. and Training Corp. v. United States, 115 Fed. Cl. 26, 40 (2014) (quoting A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005))); see also Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. 6, 21 (2013); DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 661 (2010).

---

[12] Several documents not initially in the Administrative Record were offered to the court during its review of Framaco's bid protest. These documents included a declaration from contracting officer David Vivian and a declaration from Framaco's President Paul Kacha. The United States Court of Appeals for the Federal Circuit has emphasized that, on a motion for judgment on the Administrative Record, "'the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1379-80 (Fed. Cir. 2009) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). The Federal Circuit explained that supplementation of the record is not completely ruled out, however, that "the parties' ability to supplement the administrative record is limited." Id. at 1379. The record only should be supplemented to include documents that were not before the agency at the time the decision was made in "cases in which 'the omission of extra-record evidence precludes effective judicial review.'" Id. at 1380 (quoting Murakami v. United States, 46 Fed. Cl. 731, 735 (2000)). In the protest currently before the court, the Administrative Record, without the additional declarations, is sufficient to decide the case. The protestor's Kacha declaration generally restates the protestor's arguments and although the defendant's Vivian declaration may offer further rationale for the agency's decision, the record, without the Vivian declaration, is sufficient to explain the agency rationale. Neither of the additional offerings are critical to the court's decision.

The Administrative Dispute Resolution Act of 1996 (ADRA), Pub. L. No. 104-320, §§ 12(a), 12(b), 110 Stat. 3870, 3874 (1996) (codified at 28 U.S.C. § 1491(b)(1)-(4) (2012)), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims.   See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330-32 (Fed. Cir. 2001).   The statute provides that protests of agency procurement decisions are to be reviewed under Administrative Procedure Act (APA) standards, making applicable the standards outlined in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), and the line of cases following that decision.   See, e.g., Res. Conservation Grp., LLC v. United States, 597 F.3d 1238, 1242 (Fed. Cir.) ("Following passage of the APA in 1946, the District of Columbia Circuit in Scanwell Labs., Inc. v. Shaffer, 424 F.2d 859 (D.C. Cir. 1970), held that challenges to awards of government contracts were reviewable in federal district courts pursuant to the judicial review provisions of the APA."), aff'd, 432 F. App'x 975 (Fed. Cir. 2011); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1329 (Fed. Cir.) (citing to Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d at 864, 868, for its "reasoning that suits challenging the award process are in the public interest and disappointed bidders are the parties with an incentive to enforce the law"), reh'g denied (Fed. Cir. 2004); Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) ("Under the APA standard as applied in the Scanwell line of cases, and now in ADRA cases, 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d at 1332)); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003).   The United States Court of Appeals for the Federal Circuit has stated that the Court of Federal Claims' jurisdiction over "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement," 28 U.S.C. § 1491(b)(1), "provides a broad grant of jurisdiction because '[p]rocurement includes all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1381 (Fed. Cir. 2012) (emphasis in original) (quoting Res. Conservation Grp., LLC v. United States, 597 F.3d at 1244 (quoting 41 U.S.C. § 403(2))); see also Rockies Exp. Pipeline LLC v. Salazar, 730 F.3d 1330, 1336 (Fed. Cir. 2013), reh'g denied (Fed. Cir. 2014); Distrib. Solutions, Inc. v. United States, 539 F.3d 1340, 1346 (Fed. Cir.) ("[T]he phrase, 'in connection with a procurement or proposed procurement,' by definition involves a connection with any stage of the federal contracting acquisition process, including 'the process for determining a need for property or services.'"), reh'g denied (Fed. Cir. 2008); RAMCOR Servs. Grp., Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) ("The operative phrase 'in connection with' is very sweeping in scope.").

Agency procurement actions should be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without

observance of procedure required by law."  5 U.S.C. § 706(2)(A), (2)(D) (2012);[13] <u>see
also</u> <u>Orion Tech., Inc. v. United States</u>, 704 F.3d 1344, 1347 (Fed. Cir. 2013); <u>COMINT
Sys. Corp. v. United States</u>, 700 F.3d 1377, 1381 (Fed. Cir. 2012); <u>Savantage Fin.
Servs. Inc., v. United States</u>, 595 F.3d 1282, 1285-86 (Fed. Cir. 2010); <u>Weeks Marine,
Inc. v. United States</u>, 575 F.3d 1352, 1358 (Fed. Cir. 2009); <u>Axiom Res. Mgmt., Inc. v.
United States</u>, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (noting arbitrary and capricious
standard set forth in 5 U.S.C. § 706(2)(A), and reaffirming the analysis of <u>Impresa
Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332); <u>Blue & Gold
Fleet, L.P. v. United States</u>, 492 F.3d at 1312 ("'[T]he inquiry is whether the
[government]'s procurement decision was "arbitrary, capricious, an abuse of discretion,

---

[13] The language of 5 U.S.C. § 706 provides:

To the extent necessary to decision and when presented, the reviewing
court shall decide all relevant questions of law, interpret constitutional and
statutory provisions, and determine the meaning or applicability of the
terms of an agency action.  The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed;
and

(2) hold unlawful and set aside agency action, findings, and
conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in
accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or
short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to
sections 556 and 557 of this title or otherwise reviewed on the
record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject
to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole
record or those parts of it cited by a party, and due account shall be taken
of the rule of prejudicial error.

5 U.S.C. § 706.

or otherwise not in accordance with law."'" (quoting <u>Bannum, Inc. v. United States</u>, 404 F.3d at 1351 (quoting 5 U.S.C. § 706(2)(A) (2000)))); <u>Eco Tour Adventures, Inc. v. United States</u>, 114 Fed. Cl. at 22; <u>Contracting, Consulting, Eng'g LLC v. United States</u>, 104 Fed. Cl. at 340. "In a bid protest case, the agency's award must be upheld unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" <u>Turner Constr. Co. v. United States</u>, 645 F.3d 1377, 1383 (Fed. Cir.) (quoting <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010)), <u>reh'g and reh'g en banc denied</u> (Fed. Cir. 2011); <u>see also Glenn Defense Marine (ASIA), PTE Ltd. v. United States</u>, 720 F.3d 901, 907 (Fed. Cir.), <u>reh'g en banc denied</u> (Fed. Cir. 2013); <u>McVey Co., Inc. v. United States</u>, 111 Fed. Cl. 387, 402 (2013) ("The first step is to demonstrate error, that is, to show that the agency acted in an arbitrary and capricious manner, without a rational basis or contrary to law."); <u>PlanetSpace, Inc. v. United States</u>, 92 Fed. Cl. 520, 531-32 (2010) ("Stated another way, a plaintiff must show that the agency's decision either lacked a rational basis or was contrary to law." (citing <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1358)).

In discussing the appropriate standard of review for bid protest cases, the United States Court of Appeals for the Federal Circuit specifically addressed subsections (2)(A) and (2)(D) of 5 U.S.C. § 706, <u>see</u> <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 238 F.3d at 1332 n.5, but the Federal Circuit has focused its attention primarily on subsection (2)(A). <u>See</u> <u>COMINT Sys. Corp. v. United States</u>, 700 F.3d at 1381 ("We evaluate agency actions according to the standards set forth in the Administrative Procedure Act; namely, for whether they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A); <u>Bannum, Inc. v. United States</u>, 404 Fed. at 1351)); <u>NVT Techs., Inc. v. United States</u>, 370 F.3d 1153, 1159 (Fed. Cir. 2004) ("Bid protest actions are subject to the standard of review established under section 706 of title 5 of the Administrative Procedure Act ('APA'), 28 U.S.C. § 1491(b)(4) (2000), by which an agency's decision is to be set aside only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' 5 U.S.C. § 706(2)(A) (2000).") (citations omitted); <u>Banknote Corp. of Am., Inc. v. United States</u>, 365 F.3d at 1350 ("Among the various APA standards of review in section 706, the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" (quoting 5 U.S.C. § 706(2)(A) and citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1057-58 (Fed. Cir.), <u>reh'g denied</u> (Fed. Cir. 2000))); <u>Info. Tech. & Applications Corp. v. United States</u>, 316 F.3d at 1319 ("Consequently, our inquiry is whether the Air Force's procurement decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2)(A) (2000).").

The United States Supreme Court has identified sample grounds which can constitute arbitrary or capricious agency action:

[W]e will not vacate an agency's decision unless it "has relied on factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 658 (2007) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); see also  F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 552 (2009); Ala. Aircraft Indus., Inc.-Birmingham v. United States, 586 F.3d 1372, 1375 (Fed. Cir. 2009), reh'g and reh'g en banc denied (Fed. Cir. 2010); In re Sang Su Lee, 277 F.3d 1338, 1342 (Fed. Cir. 2002) ("[T]he agency tribunal must present a full and reasoned explanation of its decision. . . . The reviewing court is thus enabled to perform meaningful review . . . ."), aff'd on subsequent appeal, 262 F. App'x 275 (Fed. Cir. 2008); Textron, Inc. v. United States, 74 Fed. Cl. 277, 285-86 (2006), appeal dismissed sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 222 F. App'x 996 (Fed. Cir.), and dismissed per stipulation sub nom. Textron, Inc. v. Ocean Technical Servs., Inc., 223 F. App'x 974 (Fed. Cir. 2007).

Moreover,

A bid protest proceeds in two steps. First . . . the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract. Second . . . if the trial court finds that the government's conduct fails the APA review under 5 U.S.C. § 706(2)(A), then it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct.

Bannum, Inc. v. United States, 404 F.3d at 1351; Eco Tour Adventures, Inc. v. United States, 114 Fed. Cl. at 22; Archura LLC v. United States, 112 Fed. Cl. 487, 496 (2013).

A disappointed bidder has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence.  See Grumman Data Sys. Corp. v. Dalton, 88 F.3d 990, 995-96 (Fed. Cir. 1996); Davis Boat Works, Inc. v. United States, 111 Fed. Cl. 342, 349 (2013); Contracting, Consulting, Eng'g LLC v. United States, 104 Fed. Cl. at 340.  The Federal Circuit has made clear that "[t]his court will not overturn a contracting officer's determination unless it is arbitrary, capricious, or otherwise contrary to law. To demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion . . . is not enough."  PAI Corp. v. United States, 614 F.3d at 1352 (citing John C. Grimberg Co. v. United States, 185 F.3d 1297, 1300 (Fed. Cir. 1999)); see also Turner Constr. Co., Inc. v. United States, 645 F.3d at 1387; Sierra Nevada Corp. v. United States, 107 Fed. Cl. 735, 759 (2012); Filtration Dev. Co., LLC v. United States, 60 Fed. Cl. 371, 380 (2004).

Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency

decision to determine if it was legally permissible, reasonable, and supported by the facts. <u>See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. at 43 ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."); <u>see</u> <u>also</u> <u>Turner Constr. Co., Inc. v. United States</u>, 645 F.3d at 1383; <u>R & W Flammann GmbH v. United States</u>, 339 F.3d 1320, 1322 (Fed. Cir. 2003) (citing <u>Ray v. Lehman</u>, 55 F.3d 606, 608 (Fed. Cir.), <u>cert.</u> <u>denied</u>, 516 U.S. 916 (1995)). ""'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."'" <u>Weeks Marine, Inc. v. United States</u>, 575 F.3d at 1371 (quoting <u>Honeywell, Inc. v. United States</u>, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting <u>M. Steinthal & Co. v. Seamans</u>, 455 F.2d 1289, 1301 (D.C. Cir. 1971))); <u>Jordan Pond Co., LLC v. United States</u>, 115 Fed. Cl. 623, 631 (2014); <u>Davis Boat Works, Inc. v. United States</u>, 111 Fed. Cl. at 349; <u>Norsat Int'l [America], Inc. v. United States</u>, 111 Fed. Cl. 483, 493 (2013); <u>HP Enter. Servs., LLC v. United States</u>, 104 Fed. Cl. 230, 238 (2012); <u>Vanguard Recovery Assistance v. United States</u>, 101 Fed. Cl. 765, 780 (2011).

   Stated otherwise by the United States Supreme Court:

   Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

<u>Citizens to Pres. Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 416 (1971), <u>abrogated</u> <u>on other</u> <u>grounds</u> <u>by</u> <u>Califano v. Sanders</u>, 430 U.S. 99 (1977) (internal citations omitted); <u>see</u> <u>also</u> <u>U.S. Postal Serv. v. Gregory</u>, 534 U.S. 1, 6-7 (2001); <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. 281, 285 (1974), <u>reh'g</u> <u>denied</u>, 420 U.S. 956 (1975); <u>Co-Steel Raritan, Inc. v. Int'l Trade Comm'n</u>, 357 F.3d 1294, 1309 (Fed. Cir. 2004) (In discussing the "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with the law" standard, the Federal Circuit stated: "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."); <u>In re Sang Su Lee</u>, 277 F.3d at 1342; <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058 ("The arbitrary and capricious standard applicable here is highly deferential. This standard requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." (citing <u>Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.</u>, 419 U.S. at 285)); <u>Lockheed Missiles & Space Co. v. Bentsen</u>, 4 F.3d 955, 959 (Fed. Cir. 1993); <u>BCPeabody Constr. Servs., Inc. v. United States</u>, 112 Fed. Cl. 502, 508 (2013) ("The court 'is not empowered to substitute its judgment for that of the agency,' and it must uphold an agency's decision against a challenge if the 'contracting agency provided a coherent and reasonable

explanation of its exercise of discretion.'" (quoting Keeton Corrs., Inc. v. United States, 59 Fed. Cl. 753, 755, recons. denied, 60 Fed. Cl. 251 (2004), and Axiom Res. Mgmt., Inc. v. United States, 564 F.3d at 1381)), appeal withdrawn, 559 F. App'x 1033 (Fed. Cir. 2014) (internal citations omitted); Supreme Foodservice GmbH v. United States, 109 Fed. Cl. 369, 382 (2013); Alamo Travel Grp., LP v. United States, 108 Fed. Cl. 224, 231 (2012); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57, 63 (2001), aff'd, 30 F. App'x 995 (Fed. Cir. 2002); Ellsworth Assocs., Inc. v. United States, 45 Fed. Cl. 388, 392 (1999) ("Courts must give great deference to agency procurement decisions and will not lightly overturn them." (citing Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985))), appeal dismissed, 6 F. App'x 867 (Fed. Cir 2001), and superseded by regulation as recognized in MVS USA, Inc. v. United States, 111 Fed. Cl. 639 (2013).

According to the United States Court of Appeals for the Federal Circuit:

> Effective contracting demands broad discretion. Burroughs Corp. v. United States, 223 Ct. Cl. 53, 617 F.2d 590, 598 (1980); Sperry Flight Sys. Div. v. United States, 548 F.2d 915, 921, 212 Ct. Cl. 329 (1977); see NKF Eng'g, Inc. v. United States, 805 F.2d 372, 377 (Fed. Cir. 1986); Tidewater Management Servs., Inc. v. United States, 573 F.2d 65, 73, 216 Ct. Cl. 69 (1978); RADVA Corp. v. United States, 17 Cl. Ct. 812, 819 (1989), aff'd, 914 F.2d 271 (Fed. Cir. 1990).

Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59. Therefore, as the Federal Circuit further has indicated:

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted). Accordingly, procurement decisions are subject to a "highly deferential rational basis review." CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1354 (Fed. Cir. 2008) (internal quotation marks omitted). Applying this highly deferential standard, the court must sustain an agency action unless the action does not "evince[ ] rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (alterations added).

PAI Corp. v. United States, 614 F.3d at 1351; see also Weeks Marine, Inc. v. United States, 575 F.3d at 1368-69 ("We have stated that procurement decisions 'invoke[ ] "highly deferential" rational basis review.' Under that standard, we sustain an agency action 'evincing rational reasoning and consideration of relevant factors.'" (quoting CHE Consulting, Inc. v. United States, 552 F.3d at 1354 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058))); Cohen Fin. Servs., Inc. v. United States, 112 Fed. Cl. 153, 162 (2013); McVey Co., Inc. v. United States, 111 Fed. Cl. at 402.

For example, "agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.'" Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d at 958-59 (quoting Tidewater Management Servs., 573 F.2d at 73, 216 Ct. Cl. 69); see also Res-Care, Inc. v. United States, 735 F.3d 1384, 1390 (Fed. Cir.) ("DOL [Department of Labor], as a federal procurement entity, has 'broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation.'" (quoting Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009))), reh'g en banc denied (Fed. Cir. 2014); Grumman Data Sys. Corp. v. Dalton, 88 F.3d at 995; Kingdomware Techs., Inc. v. United States, 107 Fed. Cl. 226, 231 (2012) ("'Federal procurement entities have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation."'" (quoting K-Lak Corp. v. United States, 98 Fed. Cl. 1, 8 (2011) (quoting Tyler Constr. Grp. v. United States, 570 F.3d at 1334)), aff'd, 754 F.3d 923 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014).

In addition, the court "assume[s] that the government acts in good faith while contracting." Galen Med. Assocs., Inc. v. United States, 56 Fed. Cl. 104, 108 (2003), aff'd, 369 F.3d 1324 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Madison Servs., Inc. v. United States, 92 Fed. Cl. 120, 129 ("The court's review is thus guided by the 'well-established principle that contracting officials are presumed to act in good faith when executing their procurement functions.'" (quoting Aero Corp. v. United States, 38 Fed. Cl. 408, 413 (1997))), relief from judgment denied, 94 Fed. Cl. 501 (2010). A protestor must show "'well-nigh irrefragable proof' that the government had an intent to injure it to overcome this presumption." Galen Med. Assocs., Inc. v. United States, 56 Fed. Cl. at 108 (quoting Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954)); see also Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("We assume the government acts in good faith when contracting. Torncello [v. United States], 681 F.2d [756,] 770 [(1982)]; Librach v. United States, 147 Ct. Cl. 605, 1959 WL 7633 (1959). A contractor can overcome this presumption only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it. Torncello, 681 F.2d at 770."); Madison Servs., Inc. v. United States, 92 Fed. Cl. at 129.

In the above captioned bid protest, Framaco states, "[s]ince the solicitation did not preclude use of an inflation adjustment and the agency had regularly used inflation adjustments in the past, Framaco reasonably assumed that an inflation adjustment could and would be used here." Framaco characterizes the agency decision not to apply an inflation adjustment to its prequalification submission of the Belgrade, Serbia project as "fundamental error of law" because, according to the protestor, the agency "believed that it was legally prohibited from making an inflation adjustment." During oral argument, protestor focused heavily on a statement in the contracting officer's July 21, 2014 final decision in response to Framaco's agency level protest, which stated: "The FedBizOpps announcement and the Act do not indicate that an inflation adjustment to the project value is authorized or warranted; therefore, it would be improper for the Government to apply such an adjustment to any submission by any offeror." Therefore, the protestor

—

asks this court to review the agency's determination under a de novo standard of review. Protestor alleges that the issue in the above captioned protest "is not one of agency business judgment or a complex technical matter; it is a straightforward question of law" and protestor "only challenges OBO's legal error." The Administrative Record does not support protestor's characterization that the agency acted because it believed it was legally barred from using an inflation index, rather the agency chose not to use an inflation adjustment for this solicitation, and the solicitation did not include any indication that an inflation adjustment would be used.

Several documents in the Administrative Record bear on the discussion. First, a handwritten note from DOS attorney Dennis Gallagher to DOS employee Donna Neal states: "There is nothing in the FedBizOpps announcement or in the law/regulation to support such an adjustment, and no showing that such an adjustment is warranted." In a June 24, 2014 letter to Framaco, signed by Ms. Neal as "Contracting Officer," a nearly identical statement appears: "There is nothing in the FedBizOpps announcement or in the regulation/law to support such an adjustment, and no showing of such and [sic] adjustment is warranted." In response to Framaco's agency level protest, an August 5, 2014 letter from DOS Departmental Competition Advocate Eric Moore, states: "the solicitation does not include inflation adjustment as an evaluation method. As such, applying it to your response would prejudice other responses on which it was not applied. The Contracting Officer therefore is unable to apply the inflation adjustment to any of the responses, including yours."

Nothing in the Notice of Solicitation or the Diplomatic Security Act required the agency evaluation and prequalification process to adjust for inflation or indicated that an inflation adjustment would be applied when reviewing proposers' evidence of prior, similar work. The Notice of Solicitation did not include any indication that the prequalification process would utilize an inflation adjustment, rather, the Notice of Solicitation includes a clear, specific, and unequivocal statement that a $124 million minimum qualification threshold would be utilized by the agency to review and prequalify the proposals. Moreover, DOS did not use an inflation adjustment when reviewing any of the submissions, and indicated in the August 5, 2014 letter to Framaco that to apply an inflation index just for Framaco would result in prejudice to other offerors. Defendant and the intervenor also correctly argue that Congress did not include any reference to inflation adjustments in the Diplomatic Security Act and that the implementing regulations likewise make no reference to an inflation adjustment. See Diplomatic Security Act, § 402; 22 U.S.C. § 4852; 48 C.F.R. § 636.104-71 (2013); 48 C.F.R. § 652.236-72 (2013). In fact, the language of the Diplomatic Security Act and its implementing regulations are silent on the subject, and neither preclude, nor require, OBO to apply an inflation adjustment. Just because OBO used an inflation adjustment when evaluating solicitations covered by the Diplomatic Security Act in the past, does not alter the clear words of the solicitation currently under review and the clear $124 million contract value threshold stated in that solicitation.

Trying to turn the void to its advantage, protestor suggests that "nothing in the Section 402 definitions [of the Diplomatic Security Act] limits the agency from adjusting

past projects for inflation, nor has the agency cited to any provision in support." Protestor contends that no regulation bars an inflation adjustment. (citing Caddell Constr. Co., Inc., B-298949.2, 2007 WL 1893209, at *7-8 (Comp. Gen. June 15, 2007)). Protestor, however cites only to general language noting overall guiding principles, for example, that "[t]he agency's position appears to be that, since the agency rules did not address an inflation adjustment, it was barred." Protestor argues this position is contrary to the FAR § 1.102(d) (2013), Statement of guiding principles for the Federal Acquisition System, which states: "In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority." FAR § 1.102(d).

The Notice of Solicitation at Section 4.A makes clear that the Diplomatic Security Act applies to the procurement of the Harare, Zimbabwe project:

> Firms being considered for award under this acquisition are limited to "*United States Person*" bidders as defined in the Act.[14] The Offeror must complete and submit as part of its pre-qualification package the pamphlet "Certifications Relevant to Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986."

(emphasis in original). Under the Diplomatic Security Act, only "United States persons" could bid on diplomatic design and construction work with an estimated total project value exceeding $10,000,000.00 or more. See 22 U.S.C. § 4852(a)(1). As the total project value for the Harare, Zimbabwe project is estimated between $165 million and $210 million, the Diplomatic Security Act applies to the Harare, Zimbabwe project. Therefore, the statute and implementing regulations do not preclude or require OBO to apply an inflation adjustment when evaluating the solicitation at issue, and leaves the decision as to whether to apply such an inflation adjustment within the agency's discretion.

The regulation at FAR § 1.102(d) also is silent on the possible application of an inflation adjustment, and further supports the agency's discretion to choose whether or

---

[14] To be a United States person, a potential offeror must show, among other requirements, that it "has performed within the United States or at a United States diplomatic or consular establishment abroad administrative and technical, professional, or construction services similar in complexity, type of construction, and value to the project being bid." 22 U.S.C. § 4852(c)(2)(D). The implementing regulations to the Diplomatic Security Act define "value" as "mean[ing] the total contract price of the project, not to the profit or loss to the bidder/offeror." 48 C.F.R. § 652.236-72. There are no allegations that Framaco was not a United States person for purposes of the Diplomatic Security Act.

not to apply an inflation factor based on the best interests of the government. <u>See</u> FAR § 1.102(d) ("In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority."); <u>see also</u> <u>Tyler Constr. Grp. v. United States</u>, 570 F.3d at 1333 ("In other words, government officers are authorized, indeed, encouraged, in exercising personal initiative in procurement matters, to assume that 'a specific strategy, practice, policy or procedure' that is not 'addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation' and that 'is in the best interests of the Government,' 'is a permissible exercise of authority.' . . . The Corps, like other federal procurement entities, has broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation." (quoting FAR § 1.102(d))); <u>SEK Solutions, LLC v. United States</u>, 117 Fed. Cl. 43, 49 (2014) ("In the absence of a violation of law, FAR 1.102(d) provides the agency with a degree of flexibility in crafting its procurement." (citing <u>Tyler Constr. Grp. v. United States</u>, 570 F.3d at 1333)); <u>FirstLine Transp. Sec., Inc. v. United States</u>, 107 Fed. Cl. 189, 203-04 (2012) (An agency's stated goal of 40 percent small business participation, as measured by total contract price, was lawful when "nothing in the FAR affirmatively prohibits an agency from establishing such goals in terms of total contract value" and "FAR 1.102(d) expressly provides that contracting officers 'may assume if a specific strategy, practice, policy or procedure . . . is not addressed in the FAR, nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.'" (quoting FAR § 1.102(d))) (omission in original). The choice of whether or not to apply an inflation adjustment in the protest currently before the court properly was left to the agency's discretion.

As noted above, protestor relies on <u>Caddell Construction Co., Inc.</u>, B-298949.2, 2007 WL 1893209, at *7-8 as "endors[ing] an agency evaluation under which the agency adjusted an offeror's previous work to reflect inflation under Section 402(d)." Defendant also relies on <u>Caddell Construction Co.</u>, but for the GAO's finding that it knew "'of no statute or regulation that was violated by the agency's decision to adjust for inflation the price of the earlier project to determine its approximate current value,'" and that as a result, the agency action was a proper exercise of discretion. (quoting <u>Caddell Constr. Co.</u>, B-298949.2, 2007 WL 1893209, at *7). Intervenor similarly argues, "[n]othing in <u>Caddell Construction</u> provides that OBO is required to apply inflation adjustments regardless of the Government's best interests or language of the solicitation documents" and states <u>Caddell</u> instead "merely provides that the [Diplomatic] Security Act is silent regarding inflation adjustments and the decision of whether or not to apply an adjustment 'seems to fall within the reasonable exercise of the agency's discretion.'" (quoting <u>Caddell Constr. Co.</u>, B-298949.2, 2007 WL 1893209, at *8).

In <u>Caddell</u>, the GAO addressed a bid protest challenging an award under an RFP issued by OBO for design and construction of a new United States embassy compound pursuant to the Diplomatic Security Act. In <u>Caddell</u>, the awardee met the requirements

of the Diplomatic Security Act, in part, because for that procurement, "[t]he agency determined that the value of the [awardee's reference] project as adjusted for inflation was $55 million and thus within the $50–$60 million estimate the government originally prepared for the current . . . project." Id. at *6. The GAO indicated "[o]n the question of similar value, we know of no statute or regulation that was violated by the agency's decision to adjust for inflation the price of the earlier project to determine its approximate current value." Id. at *7. The GAO continued, "[i]n fact, the approach of calculating such an adjustment for the purposes of determining a current value for the earlier project seems to fall within the reasonable exercise of the agency's discretion." Id. (citing OMNI Gov't Servs., LP, B-297420.2 et al., 2006 WL 744276, at *2 (Comp. Gen. Mar. 22, 2006)). Although not prohibiting use of an inflation adjustment, the Caddell decision does not mandate its use and, instead, reemphasizes the discretionary nature of whether or not to apply an inflation adjustment.

Nor is OBO's decision not to apply inflation adjustments in the above captioned protest inconsistent with the requirements in the CICA and part 6 of the FAR, that agencies maximize competition. Protestor encourages the court to "take into account the requirements of CICA and the FAR that agencies maximize competition," and argues that the CICA allows only a limited number of exceptions. Protestor requests the court to "interpret the relevant statutory and regulatory provisions and case law in a liberal manner that effectuates competition." According to the protestor, "neither CICA, nor the FAR . . . prohibit an inflation adjustment" and both "call for competition to the maximum extent practicable." Therefore, protestor argues that what it perceives to be OBO's interpretation that an inflation adjustment was precluded by the solicitation and regulation "is anti-competitive and contrary to CICA and the FAR because OBO's interpretation substantially limits competition." Protestor urges that "[i]nflation adjustments are congruent with the policy and intent of CICA and the FAR competition requirements," and notes that the FAR encourages contracting officers to adopt liberal interpretations, and such action is consistent with the mandates of the CICA to maximize competition. Protestor indicates that "allowing an inflation adjustment is reasonable given the construction services of the type being required here, especially where there are a limited number of potential offerors." Protestor indicates it is "not asking OBO to remove the prequalification requirement, rather Framaco is asking that OBO conduct its evaluation in accordance with the CICA requirements and on a non-disparate basis," so that the agency does not "unduly" restrict competition.

Intervenor asserts that OBO's decision "does not impermissibly limit competition under the Competition in Contracting Act, 41 U.S.C. § 3301 et seq." Citing to the Diplomatic Security Act and corresponding legislative history, intervenor argues that "Congress, in its judgment and authority, found that some limit to competition is necessary to protect the Government's interests in diplomatic construction work." Specifically, regarding the Diplomatic Security Act, intervenor contends, "Congress provided that an offeror's performance of similarly valued work 'will help ensure that a firm is technically capable to carry out a given project.'" (quoting H.R. Rep. No. 99-494, at 17 (1986), reprinted in 1986 U.S.C.C.A.N. 1865, 1883). Intervenor further argues, "[t]his is a Congressionally-authorized protocol to prevent unqualified firms from

31

receiving contracts key to United States' diplomacy and security – not an impermissible restriction on competition." Defendant adds that "[e]ach prospective offer was subject to the same objective threshold of $124 million" and "as a result, each was provided an equal opportunity to compete." Defendant notes that the "CICA affords agencies the discretion to 'use the competitive procedure or combination of competitive procedures that is **best suited** under the circumstances of the procurement.'" (citing 41 U.S.C. § 3301) (emphasis in original).

Although protestor may be correct that, in the past, on various solicitations for DOS building contracts under the Diplomatic Security Act, the agency applied inflation adjustments to calculate the value of projects previously performed, the decision in the solicitation currently before the court to set a fixed contract value threshold at $124 million, or 75 percent of the minimum projected value of the contemplated project, without considering an inflation index was permissible and there is no evidence that the decision was unduly restrictive or applied in a disparate manner. As portrayed below in chart form, the May 12, 2014, internal Gallagher Memorandum presented contract value thresholds for each of the five projects that each represents 75 percent of the minimum projected value of that project, rounded to the nearest million.

| Project Name | Minimum Approximate Design-Build Cost of Project | 75% of Minimum Approximate Design-Build Cost | Contract Value Threshold |
|---|---|---|---|
| SAQMMA14R0101 NCC Erbil, Iraq | $250 million | $187.5 million | $187 million |
| SAQMMA14R0108 NEC Ashgabat, Turkmenistan | $180 million | $135 million | $135 million |
| SAQMMA14R0115 NEC Harare, Zimbabwe | $165 million | $123.75 million | $124 million |
| SAQMMA14R0118 NEC Pristina, Kosovo | $155 million | $116.25 million | $116 million |
| SAQMMA14R0117 NCC Nuevo Laredo, Mexico | $68 million | $51 million | $51 million |

The decision to choose the 75 percent figure has not been demonstrated as arbitrary or capricious. Moreover, the Administrative Record reflects that the agency's use of a specific contract value threshold in this solicitation sought to remove uncertainty from the procurement prequalification process. The May 12, 2014 Gallagher Memorandum explained:

> There has also been some uncertainty as to what project value should be required for the construction services to be considered similar in value to

32

the project being solicited. To avoid uncertainty, each FedBizOpps announcement provided that to meet the experience requirement a potential offeror must have completed a construction contract involving work of the same general type and complexity as the project for which it seeks prequalification and having a contract or subcontract value exceeding a specified amount as follows: 1) Erbil $187 million; 2) Ashgabat $135 million; 3) Harare $124 million; 4) Pristina $116 million; 5) Nuevo Laredo $51 million.

The July 21, 2014 final decision issued by the contracting officer also explained that the contract value threshold of $124 million was "a specific, definite, and unequivocal reference to a mandatory threshold for qualification." The contracting officer further indicated: "Please also note that the announcement and prequalification evaluation criteria has been totally revised and more clearly defined for 2014 so any allowance that may have been appropriate in previous years cannot be brought forward into this clearer unambiguous qualification process." The August 5, 2014 letter from DOS Departmental Competition Advocate Eric Moore also indicated to Framaco, "[u]nfortunately, the solicitation does not include inflation adjustment as an evaluation method. As such, applying it to your response would prejudice other responses on which it was not applied. The Contracting Officer therefore is unable to apply the inflation adjustment to any of the responses, including yours."

Defendant and intervenor agree that, as stated by defendant, "[t]he Notice of Solicitation expressly states that prospective offerors must demonstrate similar work as evidence[d] by a 'contract or subcontract value of *at least $124 million*.'" (emphasis in original). Defendant further provides that OBO defines "value" as "the total contract price of the project." The contracting officer and DOS Departmental Competition Advocate reference this amount as a "specific, definite, and unequivocal . . . mandatory threshold for qualification." The agency evaluated protestor's prequalification submission pursuant to the terms of the Notice of Solicitation.

The email exchange with the contracting officer for clarification also did not obligate the agency to use an inflation index. Although suggesting to Framaco that it could "attempt to explain or justify why the Government should consider a number less than the stated minimum," the email, in fact, gives notice to Framaco that the explanation or justification "may not be successful." (emphasis added). Moreover, Framaco's email to DOS and receipt of the contracting officer's response demonstrate that Framaco either understood or should have understood in advance of submitting its proposal that the Notice of Solicitation did not contain any assurance that an inflation adjustment would be utilized and that OBO had made no commitments to apply an inflation adjustment when evaluating the prequalification submissions of proposers. Moreover, intervenor points out that "Framaco does not allege that its prior experience with OBO includes circumstances, such as here, where a minimum threshold (less than the expected cost of the project being bid) was included in the Notice of Solicitation." Intervenor also states, "[a]s such, Framaco was put on notice that OBO's prior practices in applying inflation adjustments would be inapplicable here."

Defendant further points out that "Framaco's understanding of DOS's prior practices, as well as its expectations for this Project, are irrelevant to the issue here, *i.e.*, what the contracting officer considered or should have considered in evaluating Framaco's Pre-Qualification Submission for **this** Project." (emphasis in original). Defendant highlights that, "[n]otably, Framaco does not point to the language itself in asserting that the Notice of Solicitation is ambiguous." Moreover, Defendant argues that, "Framaco's contention that the contracting officer agreed to consider inflation is factually inaccurate" and instead "Framaco was put on notice that it was taking a risk in submitting evidence of prior work that was below the stated minimum threshold of $124 million."

The agency's decision not to apply an inflation or other adjustment to Framaco's prequalification submission was based on a rational interpretation and application of the terms of the Notice of Solicitation. The May 12, 2014 Gallagher Memorandum, the contracting officer's final decision, and the DOS Departmental Competition Advocate's denial of Framaco's request for reconsideration all reviewed and reiterated that the $124 million figure was a clear and specific threshold for prequalification. Even protestor concedes that "the solicitation was silent as to whether an inflation adjustment would be used here," and that "[t]he solicitation does not address whether contract value would be adjusted for inflation to reflect the actual value of the project in 2014 dollars." The Notice of Solicitation clearly instructed that:

> To demonstrate performance of similar construction work for Omnibus Diplomatic Security and Antiterrorism Act of 1986 purposes, the offeror needs to provide information demonstrating that it has successfully completed in the United States or at a U.S. diplomatic or consular mission a construction contract or subcontract involving work of the same general type and complexity as the solicited project and having a contract or subcontract value of at least $124 million.

(emphasis added). As noted above, nothing in the language of the Notice of Solicitation requires the agency to apply an inflation adjustment. Under section "**4. *Mandatory Pre-Qualification Requirements***" (emphasis in original), the Notice of Solicitation provided: "[t]he Offeror shall submit sufficient documentation to allow DOS to evaluate its capabilities with respect to the factor(s) and qualification criteria listed. Submissions that are missing the required information or otherwise do not comply with the submission requirements may be eliminated from consideration at the Contracting Officer's determination." The Notice of Solicitation required potential offerors to "complete and submit as part of its pre-qualification package the pamphlet 'Certifications Relevant to Public Law 99-399, Statement of Qualifications for Purpose of Section 402 of The Omnibus Diplomatic Security and Antiterrorism Act of 1986.'"

The pamphlet instructed prospective offerors to "*Use this Guide for All FY 2014 Project Submissions Include a copy in each Qualification Submission.*" (emphasis in original). The pamphlet defined the term "VALUE" (capitalization in original) as follows:

"'**VALUE'**—This term refers to the total contract price of the project, not to the profit or loss to the contractor." (capitalization and emphasis in original). Notably, the pamphlet clearly and explicitly stated:

> Section 402 of the Omnibus Diplomatic and Antiterrorism Act of 1986 provides that a "United States person" must meet certain requirements, listed in subsections 402(c)(2) and (3) of the Act, to be eligible for the statutory preference. To assist individuals to determine whether or not they qualify as a U.S. person . . . entitled to preference under Section 402, guidance is provided on this pre-qualification form.

> For ease of reference, the statutory language will be quoted immediately before the definitions that apply to it. Space for the information requested is provided immediately following definitions. <u>The Department of State reserves the right, in its sole discretion, to interpret and apply the definitions to the information provided by each prospective offeror.</u>

(emphasis added).

Framaco's inquiry by email to the contracting officer, Mr. Vivian, and also to Ms. Savage, stated:

> We reviewed the pre-qualification Notice for the new Harare post.

> The below Phase I requirements calls for a $124M completed US diplomatic mission.

> Kindly advise if we can apply using a $122M completed project that was awarded in 2009 and if needed adjusting to inflation to meet the Harare requirement?

Based on the correspondence, protestor argues that "[t]he agency invited Framaco to submit a response as to why an inflation adjustment was warranted but summarily rejected that explanation in an arbitrary and capricious fashion, based on an erroneous conclusion of law, and without any reasonable or consistent analysis." Framaco argues that, "[i]n accordance with CO's [contracting officer's] pre-proposal email, Framaco's prequalification proposal included a statement explaining why an inflation adjustment was warranted," but "OBO summarily rejected the inflation adjustment based on erroneous conclusions of law." (internal citation omitted).

The contracting officer's April 7, 2014 response stated: "The stated minimum is $124. You may attempt to explain or justify why the Government should consider a number less than the stated minimum but that is your decision and it may not be successful." Although Framaco relies on this correspondence to argue "the agency indicated that an adjustment would be considered" and that this "provided no indication that an inflation adjustment was barred in any way by the solicitation or anything else," it

is not correct for protestor to suggest that the DOS official's indication that an adjustment would be considered is equivalent to assuming that an inflation adjustment would be applied. Although the contracting officer's April 7, 2014 email provided that Framaco "may" attempt to explain or justify an inflation adjustment, the email does not bind OBO to apply an inflation adjustment or to consider Framaco's proposal if a project not meeting the $124 million threshold was offered by Framaco in its prequalification submission. As the email plainly states, any attempts to "explain or justify" an amount below $124 million "is your decision and it may not be successful." The April 7, 2014 email correspondence between Framaco and the DOS did not alter the solicitation requirements. The court finds the agency's decision not to apply an inflation adjustment to Framaco's prequalification submission is in accordance with the terms of the Notice of Solicitation. From the Notice of Solicitation, Framaco was put on notice and was aware that, to prequalify, its proposal was required to demonstrate previous work having a contract value of at least $124 million.

Framaco offers an additional argument in a footnote in its motion for judgment on the Administrative Record that:

> In addition, the true contract value for the Belgrade project exceeds $124 million even without an inflation adjustment. The agency has failed to take into account the approximately $[redacted] million in REAs that are outstanding on the Belgrade, Serbia project. The Belgrade project is not subject to any liquidated damage assessment and any reasonable analysis shows that the contract value exceeds $124 million. Even if only a portion of the outstanding REAs are recognized by OBO, the total project cost certainly exceeds the threshold and establishes that Framaco meets this qualification requirement.

(internal citations omitted). In protestor's reply brief, Framaco tries to rely on case law that states: "Some information is too close at hand for the agency to ignore." (citing Wells v. United States, 46 Fed. Cl. 178, 182 (2000)). During oral argument, protestor also indicated that the agency has formally acknowledged protestor is owed something on the Belgrade, Serbia project. Framaco notes that although it claims a far greater entitlement on the Belgrade, Serbia project REAs, the government had offered to settle Framaco's REAs in the amount of $[redacted] million. Even adding $[redacted] million to $122.6 million, the total value is still shy of the $124 million contract value threshold. Regardless, at the time of the prequalification evaluation, the parties all acknowledge that the REA settlement was not yet final and, therefore, could not be considered as part of the contract value of the Belgrade, Serbia project for the prequalification evaluation.

Intervenor points out that under the implementing regulations for the Diplomatic Security Act, value of a contract is defined as "the total contract price of the project . . ." 48 C.F.R. § 652.236-72, and that "the price of a contract is not increased until and unless the Government *grants* a pending REA." (emphasis in original). Intervenor also notes that Framaco's prequalification submission package listed the value of the

Belgrade, Serbia project as $122.6 million in value, made no mention of pending REAs, and did not request OBO to take REAs into account. Moreover, because OBO did not consider pending REAs for other prospective offerors for this solicitation, it would not have been appropriate to do so when evaluating Framaco's prequalification submission.

Therefore, the agency decision not to adjust for inflation or take into account pending REAs was reasonable, not arbitrary or capricious, or a violation of the law. OBO exercised its discretion reasonably and in accordance with the stated terms of the Notice of Solicitation when it refused to apply unstated criteria to evaluate Framaco's, or any other offeror's, submission. "It is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation . . . . It thus is beyond peradventure that the government may not rely upon undisclosed evaluation criteria in evaluating proposals . . . ." Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004) (internal citations omitted); see also PlanetSpace, Inc. v. United States, 92 Fed. Cl. at 536-37; NEQ, LLC v. United States, 88 Fed. Cl. 38, 47-48 (2009). The $124 million figure included in the Notice of Solicitation, which was approximately 75 percent of the minimum of the range of the approximate design-build cost for the Harare, Zimbabwe project, provided a definite threshold for determining compliance with the Diplomatic Security Act. Thus, offerors which might not meet the minimum of the range for the approximate design-build cost for the Harare, Zimbabwe project, nonetheless, could compete. Whether or not OBO applied inflation adjustments in the past, but chose not to do so regarding the solicitation at issue, is not controlling, given the clarity of the Notice of Solicitation, the apparent uniformity by DOS not to apply an inflation adjustment to any offeror, and the uniform enforcement of the $124 million prequalification threshold, once the Pernix Group error was corrected.

Protestor also adds a claim of disparate treatment. Stating the obvious, protestor contends it is "axiomatic that agencies must treat offerors on a fair and consistent basis" and indicates that agencies are barred from treating offerors on a disparate basis. Protestor tries to extend this axiom to its protest by stating: "OBO has previously used inflation-adjusted contract values or contract values that take into account modifications, REAs and other contract adjustments in order to evaluate prequalification submissions." Protestor argues that "OBO has adopted an inconsistent and discriminatory interpretation of the Omnibus Act [Diplomatic Security Act] in a manner that materially prejudices Framaco," and that, "[w]hen an agency departs from its prior practice in an inconsistent fashion such action is arbitrary and capricious." Protestor also states that defendant "has acted in an unfair and disparate manner by failing to prequalify Framaco under the circumstances addressed here" and "has acted in an anti-competitive and unlawful manner by excluding Framaco from the Harare competition based on an unduly restrictive interpretation of the solicitation that is inconsistent with OBO's past actions and governing law." According to the protestor, with the procurement for the Harare, Zimbabwe project, OBO "dramatically shifted" its method and changed its procurement practice regarding its interpretation of contract value by failing to allow for application of an inflation factor. The protestor states:

> OBO has previously used inflation-adjusted contract values to determine whether an offeror is eligible for OBO procurements, including procurements subject to the Omnibus Diplomatic Security and Anti-Terrorism Act of 1986 (the 'Omnibus Act') (Public Law No. 99-399, codified at 22 U.S.C. § 4852), the Percy Amendment and similar thresholds involving past performance considerations.

Protestor points out that under previous solicitations, Framaco submitted projects to OBO which OBO adjusted for inflation. Protestor provides two examples. Framaco alleges it used a [redacted] construction project for prequalification on a 2008 solicitation and the OBO adjusted for inflation, in part, due to the increase in the price of construction materials over four years. Framaco's other example notes that OBO prequalified Framaco in [redacted] for a project with an estimated design-build cost of US$175 to $200 million, higher than the range established for the Harare, Zimbabwe project, and for which Framaco assumed that the prequalification determination was based in part on inflation adjustments. In support, protestor again points to the GAO protest in Caddell Construction Company, Inc., B-298949.2, 2007 WL 1893209, to suggest that the practice of applying adjustments was not limited to Framaco. Moreover, protestor also asserts that "OBO's previous interpretation is premised in and consistent with OBO's own recognition of the rising costs of construction" and protestor provides examples of that recognition.

Protestor relies heavily on Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220 (1997) and cites a number of other cases, contending that, under Redland ""an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently""" and the agency must provide a rational basis for departing from its previous procurement practice, even if those practices were based on non-binding guidance. (quoting Redland Genstar, Inc. v. United States, 39 Fed. Cl. at 234-35 (quoting Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996))). Protestor concludes "OBO has not and cannot provide a rational explanation for refusing to consider inflation in this procurement" and for abandoning its previous approach.

The protestor's disparate treatment arguments fail under protestor's own legal standard. In Redland Genstar, Inc. v. United States, the United States Army Corps of Engineer (Corps) issued a solicitation for the construction of a stone dike. See id. at 222. In Redland, a Judge of this court concluded that "some rational basis is needed to explain the Corps' decision to apply different abrasion tests" to one project and not the project at issue in the protest, given the similarities of the two. See id. at 234 (citing Transactive Corp. v. United States, 91 F.3d at 237). The court noted that the Corps in the specific procurement at issue had departed from construction guidance in EM 1110–2–2302, the Corps' engineering manual for "Construction With Large Stone" that the Corps had previously followed. See id. at 223, 227. The court in Redland found that "[t]he Corps is certainly entitled to depart from previous practice and the nonbinding engineering guidance contained in EM 1110–2–2302, but it must provide a rational basis for doing so." Id. at 234 (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.

Ins. Co., 463 U.S. at 57). Ultimately, the Redland court found that the agency had failed to provide a rational connection between the agency decision and the facts associated with the project, even though defendant was given an opportunity to present someone at the agency involved with the project to "explain to the court and to plaintiff why the conditions at Poplar Island provide a reasonable basis for the Corps' choice of abrasion tests" and the "[d]efendant declined to take this opportunity." Id. at 233. In the above captioned protest, protestor's claim would fail even under Redland because, as the Redland court stated, an agency is entitled to depart from previous practice if a rational basis is provided. In the first place, no internal agency guidance previously governed DOS procedures regarding whether or not to apply an inflation adjustment. Moreover, the Administrative Record in the current protest under review reflects a rational basis for the agency's decision not to apply an inflation index, namely, to avoid uncertainty regarding the requirements of the solicitation, changing the procurement method announced in the Notice of Solicitation for the Harare, Zimbabwe project, as well as for the other four projects referenced in the Notice of Solicitation.

Both defendant and intervenor contend that protestor's disparate treatment allegation must fail, and both note that nowhere in its complaint does Framaco allege that OBO considered inflation or other adjustments for other prospective offerors for the same procurement and declined to do so for Framaco. According to defendant and intervenor, each procurement stands on its own and OBO's potential consideration of inflation and other adjustments in prior, unrelated procurements is not relevant to the procurement in the above captioned protest. According to defendant, "[c]ase law makes clear that an agency is not bound to act consistently across procurements" but is "free to establish new methods for conducting their procurements." (citing Griffy's Landscape Maint. LLC, v. United States, 51 Fed. Cl. 667, 671 (2001); Renic Corp., Gov't Sys. Div., B-248100, 1992 WL 189192, at *3 (Comp. Gen. July 29, 1992)). Defendant also argues that in accordance with G4S Technology CW LLC v. United States, 109 Fed. Cl. 708 (2013), an agency is afforded discretion to change its mind during the course of an evaluation, and that if an agency can switch course mid-evaluation, it can certainly change course between separate solicitations, conducted years apart. Intervenor states, ""[e]ach procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement."" (quoting SDS Int'l, Inc. v. United States, 48 Fed. Cl. 759, 772 (2001) (quoting Renic Corp., Gov't Sys. Div., B-248100, 1992 WL 189192, at *3)).

As explained in the record before the court, including the May 12, 2014 Gallagher Memorandum, the July 21, 2014 final decision letter from contracting officer David Vivian to Framaco, and the August 5, 2014 letter from DOS Departmental Competition Advocate Eric Moore to Framaco, OBO offered a rational explanation for the choice it made regarding application of an inflation adjustment even though it had applied an inflation adjustment in the past, and did not allow the practice for the Harare, Zimbabwe project and the other four projects referenced in the Notice of Solicitation. As indicated above, the May 12, 2014 Gallagher Memorandum indicated that a strict, minimum contract value that was approximately 75 percent of the minimum design-build cost of the project was set for each of the five different projects, including the Harare,

Zimbabwe project, to better avoid uncertainty regarding the solicitation requirements.

As intervenor and defendant identify, protestor did not at first argue that the agency treated protestor's prequalification submission disparately from other potential offerors in the procurement at issue here, and such an allegation was not included in Framaco's bid protest complaint. Only after the court identified a potential issue with prequalification of the Pernix Group, as recorded in the May 12, 2014 Gallagher Memorandum, and requested the parties to address the prequalification of Pernix Group, did protestor argue that OBO's treatment of Pernix Group "is the hallmark of disparate and unfair treatment contrary to CICA and the FAR." Defendant responded to the court that OBO's conclusion to prequalify Pernix Group was in error and indicated that OBO has since amended its decision and sent notice to Pernix Group that it is not prequalified to bid on the Harare, Zimbabwe project. Defendant also stated that OBO did not consider inflation or other adjustments in initially concluding that Pernix Group met the threshold. Defendant further indicated that "[a]fter learning that this error was made, Mr. Gallagher 'reviewed [his] May 12, 2014 memorandum to determine whether [he] made this same error when applying the $124 million threshold to the other prospective offerors on the Project'" and determined he did not. (alterations in original).

Such a clear error, identified easily by the court upon review of the May 12, 2014 Gallagher Memorandum, causes the court to question the care with which Mr. Gallagher arrived at his recommendations. There is no basis, however, given the record currently before the court, that other prequalification errors occurred during the evaluation by those who received the May 12, 2014 Gallagher Memorandum and the contracting officer, who signed the final decision which denied Framaco prequalification for the Harare, Zimbabwe project, nor has the protestor specifically so alleged or provided evidence to suggest additional errors. Moreover, during oral argument, protestor conceded that there was no disparate treatment within the boundaries of the particular solicitation at issue in the above captioned protest because the agency has since excluded Pernix Group.

## CONCLUSION

The court concludes that the agency's determination not to apply adjustments for inflation and not to consider the yet unresolved REAs when deciding not to prequalify Framaco for the Harare, Zimbabwe project complied with the terms of the solicitation, applicable law, regulation, and was not arbitrary or capricious. Protestor's motion for judgment on the Administrative Record is **DENIED**. Defendant's and intervenor's cross-motions for judgment on the Administrative Record are **GRANTED**. Protestor's complaint is **DISMISSED**. The Clerk of Court shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

40